**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

ALEC ARAPAHOE,

     Plaintiff,

v.

UNITED STATES OF AMERICA,
FEDERAL BUREAU OF PRISONS,
     Defendants.

---

**COMPLAINT**

---

Plaintiff, Alec Arapahoe, by and through his attorneys, David A. Lane and Eleanor K. Wedum of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint as follows:

**I. INTRODUCTION**

1.    Plaintiff Alec Arapahoe is the victim of a prison system that fails to protect its inmates by implementing even the most basic security measures.  While in the custody of the Federal Bureau of Prisons ("BOP") at the United States Penitentiary Florence, a high security institution in Colorado ("USP Florence"), Mr. Arapahoe was forced to share a cell with another inmate, Mexican, despite documentation that Mexican had previously caused Mr. Arapahoe to transfer from Federal Correctional Institution at Florence, a medium security institution in Colorado ("FCI Florence") to USP Florence because he repeatedly threatened to assault Mr. Arapahoe at FCI Florence.  Mr. Arapahoe had previously reported Mexican's threatening behavior directly to Lieutenant Miranda Avalos, who with the assistance of several other FCI officials, conducted an investigation which substantiated Mexican's threats.  Despite this knowledge, Lieutenant Avalos, together with other officers involved in the investigation failed to

1

ensure that Mr. Arapahoe was held separately from Mexican. Further, although Warden T.K. Cozza-Rhodes and other FCI officials received actual notice of the results of this investigation, no one at FCI Florence nor at USP Florence took any action to place Mr. Arapahoe in protective custody nor to hold Mr. Arapahoe and Mexican separately.  Instead, either deliberately or indifferently, BOP employees placed Mr. Arapahoe and Mexican alone in a cell together, allowing Mexican the opportunity to repeatedly rape and violently assault Mr. Arapahoe over the course of three days.  No one from BOP checked on Mr. Arapahoe during this time, despite the fact that he repeatedly hit the distress button and signaled the video camera in his cell.

2.      Mr. Arapahoe suffered, and continues to suffer, injuries from Defendants' failure to protect him from known threats while in the custody of the BOP at USP Florence.  Mr. Arapahoe was deprived of his rights under the United States Constitution as a result of Defendant's knowing and deliberate indifference to the serious risk of harm and injury to Mr. Arapahoe.

3.      This is a civil action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346, for the violation of Plaintiff Alec Arapahoe's rights perpetrated by employees of the Federal government.

## II. JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States, and is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §1346.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

5.      Plaintiff filed a claim under the Federal Tort Claims Act on June 22, 2016, which claim was denied on July 28, 2017.

6.     Plaintiff has exhausted his administrative remedies, and has obtained the relief that the administrative remedies could afford.

7.     Plaintiff has otherwise performed all acts precedent to bringing this suit or such acts have been waived.

8.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation. At all pertinent times mentioned herein, Lieutenants Avalos and Martin were employed by the Federal Bureau of Prisons, and were acting under color of federal law at the time of the incident.

### III. PARTIES

9.     Plaintiff Alec E. Arapahoe ("Arapahoe") is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado.

10.     Plaintiff Arapahoe was an inmate of the Bureau of Prisons at Federal Correctional Institution at Florence, Colorado (hereinafter FCI Florence) and USP Florence during the events giving rise to this Complaint.  He is currently incarcerated at the Delta Correctional Center in Delta, Colorado

11.     At all relevant times, the BOP officers described herein were acting within the scope of their employment with BOP and, as such, Defendant United States of America is the proper defendant under the Federal Tort Claims Act.

12.     The Federal Bureau of Prisons (hereinafter BOP) is a United States law enforcement agency, and is a subdivision of the United States Department of Justice. The BOP is responsible for the administration of the federal prison system, including USP and FCI Florence.

### IV. PROCEDURAL BACKGROUND

13.     Plaintiff initiated his administrative claim on June 22, 2016 by filing a Form 95 with the BOP for "physical and emotional injuries as a result of assault and rape" by a fellow inmate while they were both in federal custody.

14.     On October 17, 2016, Defendant BOP sent a Final Denial of Claim.

15.     On June 28, 2017, Defendant BOP sent a second letter, wherein they informed Plaintiff that Defendant had been "notified by the United States Postal Service that you [Plaintiff] may not have received" the October 2016 letter.

16.     Defendant BOP's June 2017 letter serves as a notification of final denial under 28 C.F.R. §14.9.

17.     Plaintiff has therefore exhausted his administrative remedies under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671.

## V. FACTUAL ALLEGATIONS

18.     Mr. Arapahoe, a Native American, and a homosexual, was incarcerated at FCI Florence in May 2014 when he was 21 years old and serving his first federal sentence.

19.     During his incarceration at FCI Florence, Mr. Arapahoe attempted to conceal his sexual orientation to prevent other inmates from targeting him. Despite his attempts, William Mexican, a member of the gang 073, also known as TBZ and The Boys, an inmate at FCI Florence, targeted Mr. Arapahoe. Within his first month at FCI Florence, Mexican told Mr. Arapahoe that before he even came to FCI Florence, Mexican had "heard stories" that Mr. Arapahoe was homosexual, and appeared feminine. For several weeks, Mexican menacingly followed Mr. Arapahoe around and recounted his long history of violent acts, forced Mr. Arapahoe to give him money, threatened to assault and rape him, and questioned his sexual orientation. Mexican also forced Mr. Arapahoe to go to the yard at the same time as him, and

made Mr. Arapahoe watch him work out.  Mexican also made repeated unwelcome advances on Mr. Arapahoe by providing extremely long descriptions of his masturbation and previous sexual encounters.

20.     On August 6, 2014, Mexican and two other members of his gang, threateningly accused Mr. Arapahoe of being homosexual. Mr. Arapahoe denied that he was gay. Mexican refused to believe him and told Mr. Arapahoe he had to leave the yard or he would be beaten up. Mr. Arapahoe left the yard, and immediately emailed and called Meg Bishop, asking her to call the facility at 3:45 P.M. that same day and tell officers that his life was in danger and requested that he be placed in Protective Custody.  Ms. Bishop called the facility that afternoon at 3:45 P.M. and informed Officer Wade that Mr. Arapahoe told her the other Native American inmates were making threats towards him, and his life was in danger if he was not placed in protective custody.  Shortly thereafter that same day, Officer Wade and Lieutenant Avalos conducted an interview with Mr. Arapahoe, who informed them that the Native American inmates had a meeting and "voted him off the yard," and told him he must go to the Segregated Housing Unit (SHU) or he would be assaulted for being a "Homosexual."  Mr. Arapahoe provided the names of the Native American inmates who had threatened him, specifically identifying Mexican and explaining that Mexican was somehow able to "verify" that he was a homosexual prior to coming to prison, and that he had repeatedly threatened to physically harm him.  Mr. Arapahoe made an emotional plea for help to the officers. After Mr. Arapahoe explained that he was targeted by Mexican because he was gay, Officer Wade and/or Lieutenant Avalos smiled and appeared to be on the verge of laughing. After this officer mocked Mr. Arapahoe's sexual orientation, Mr. Arapahoe was too intimidated to report that Mexican had also repeatedly threatened to rape him.

21.     Lieutenant Avalos and/or Officer Wade indicated to Mr. Arapahoe that his allegations would be investigated, and stated that his request for protective custody could not be granted immediately, but would first need to be approved based on the results of this investigation.

22.     Soon thereafter, Mr. Arapahoe was photographed, medically assessed and moved to the administrative segregation section of the Segregated Housing Unit (SHU) at the USP Florence, a maximum-security facility located next door to the medium security FCI Florence.

23.     Lieutenant Avalos, along with Officers Wade, Smith, Lammer, McEvoy, Mansfield, Quintana and Hill then conducted an investigation into Mr. Arapahoe's claims. Lieutenant Avalos reviewed video footage from the yard and was able to verify that, consistent with Mr. Arapahoe's statements, several Native American inmates indeed had held a meeting on August 6, 2014, which appeared to be a heated discussion and nearly turned into a physical altercation.

24.     As part of this investigation, on August 13, 2014, a week after Mr. Arapahoe was transferred to USP Florence, his Case Manager Officer Smith, Officer R. Lammer, a Counselor, and Officer J. McEvoy, also a Counselor, interviewed Mr. Arapahoe about Mexican's behavior at FCI Florence.  These officers asked Mr. Arapahoe why he had requested protective custody and he stated, "there is a rumor going around I sat on another native's lap."  He further explained that his sexual preference is bisexual and he had been able to keep this fact "under wraps" until recently.  Mr. Arapahoe told these Officers he believed Mexican, along with another Native American inmate, was responsible for spreading the rumor that he was gay.  As he had previously told Lieutenant Avalos and Officer Wade, Mr. Arapahoe now informed Officers Smith, Lammer and McEvoy that the Native American inmates held a big meeting on August 6,

2014 to discuss Mr. Arapahoe and that one of the Native American inmates had told Mr.

Arapahoe he was "voted off the yard" during lunch that day.  Mr. Arapahoe reiterated that in

light of the circumstances, he reasonably believed his life was in danger, so he sent an email to

Meg Bishop asking her to call the jail on his behalf.

     25.    On August 19 and August 21, 2014, Officers Mansfield, Smith and Quintana

conducted a series of interviews with the eight Native American inmates whom Mr. Arapahoe

had identified as having made threats against him.  Although most of the inmates denied

knowing anything about Mr. Arapahoe's situation or any threats made against him, when

interviewed by Officers Smith and Mansfield, Mexican openly admitted to having made threats

to Mr. Arapahoe.  In part, Mexican stated "Arapahoe has caused problems on the yard by

disrespecting the wrong people.  He created problems by calling another Native a pussy."

Additionally, per the Inmate Investigative Report summarizing this interview, Mexican "said he

doesn't take or give orders, *but claims Arapahoe will have issues if he returns to the yard.*"

(Emphasis added).

     26.    Despite Mr. Arapahoe's well-founded, consistent complaints to numerous

officers, which were clearly substantiated by video footage of the Native American meeting in

the yard and Mexican's openly menacing statements with regard to Mr. Arapahoe, Defendant

Avalos, and Officers Smith, Lammer, McEvoy, Mansfield, Quintana and Hill (who wrote a

memorandum regarding the investigation), inexplicably and with deliberate indifference to the

substantial risk of serious harm Mexican clearly posed to Mr. Arapahoe, concluded that:

> Based on the interviews conducted, written statements, telephone records,
> and emails, it is evident Arapahoe has been deceitful in this investigation.
> It has been determined that *no verifiable threat* to Arapahoe exists.  He
> should be considered an Un-Verified Protective Custody case...  It is
> recommended Arapahoe return to general population, as *there is NO
> VERIFIABLE evidence an actual threat exists*.  (Emphasis added).

27.     Instead of protecting Mr. Arapahoe from Mexican when he turned to her for help, Lieutenant Avalos punished Mr. Arapahoe for having called Meg Bishop on August 6, 2014 to alert her to the life-threatening threats leveled against him and plead with her to call prison officials on his behalf.  Lieutenant Avalos determined that Mr. Arapahoe's desperate act of self-preservation warranted the prison to "disallow appropriate GCT, LP phone and commissary [for] 60 days."

28.     Upon completion of the Inmate Investigative Report into Mr. Arapahoe's complaints, on September 8, 2016 the entire report, including Mr. Arapahoe's statements, written memoranda and summaries of Mexican's menacing statements in his interview, along with interview summaries of the other inmates, were forwarded up the chain from Lieutenant Avalos to FCI Florence Warden Cozza-Rhodes. Warden Cozza-Rhodes signed the report on September 11, 2014, indicating that presumably she had read and approved of its contents.

29.     As of September 11, 2014, *nearly an entire month before* Mexican's horrifying and brutal assault on Mr. Arapahoe, described in more detail below, Lt. Avalos had actual notice of the substantiated threats that Mexican had made, and confirmed he made, to Mr. Arapahoe, and was therefore aware of the danger Mr. Arapahoe would face if placed in a cell with Mexican. Nevertheless, the investigating prison officials refused to grant Mr. Arapahoe the protective custody he sought and took absolutely no action to ensure Mr. Arapahoe and Mexican would be kept separate in the prison.  Moreover, none of the investigating officers did anything to alert prison officials at USP Florence to the threat posed by Mexican or pass on Mr. Arapahoe's Inmate Investigative Report to USP Florence Warden Charles Daniels or anyone else at USP Florence, where Mr. Arapahoe was now being housed in SHU.  This failure to protect Mr.

Arapahoe from Mexican was a proximate cause of the three-day torture Mr. Arapahoe was forced to endure when Mexican was placed in his cell at the SHU.

30.     While in administrative segregation, Mr. Arapahoe was permitted to leave his cell for only a short break each day for recreation if the weather was nice. Meals were delivered to Mr. Arapahoe and his cellmate through a small slot in the cell door, and he had to eat in his cell. Mr. Arapahoe's cell also had a toilet and a shower, and he was not allowed to leave the cell to use the restroom or shower elsewhere.

31.     The USP Florence is one of the BOP's most violent and dangerous high-security institutions.

32.     In addition to alerting Lieutenant Avalos and other FCI Florence officers, following his transfer to USP Florence, Mr. Arapahoe also alerted Lieutenant Martin, an Segregated Housing Unit Lieutenant, regarding Mexican's threats and the danger he believed Mexican posed to him, should the two of them not be housed separately.  Additionally, Mr. Arapahoe asked Lieutenant Martin if he could speak to USP Florence Warden Daniels about his concerns regarding Mexican, but Lieutenant Martin told him that Warden Daniels was "too busy" to speak to him, and that there were no forms to file a written complaint with him. Lieutenant Martin informed Mr. Arapahoe he would need to wait to speak to Warden Daniels until he conducted rounds in the facility.

33.     Warden Daniels conducted rounds each week escorted by captains and lieutenants.  If inmates wished to speak with him, they were forced to do so in front of their cellmates. As a result, Mr. Arapahoe was unable as a practical matter to speak to Warden Daniels regarding his reasonable fears of Mexican when he conducted rounds because if Mr. Arapahoe

did so, he would risk being seen as a "snitch," placing him at an elevated risk of violent retaliation from his fellow inmates.

34.     At USP Florence, Mr. Arapahoe was placed in a cell with Benito Roman, who because of Mr. Arapahoe's sexual orientation, threatened to harm Mr. Arapahoe if he did not move cells.

35.     Mr. Arapahoe notified several unknown USP Florence officers about Mr. Roman's threats. Not only did they refuse to move him, but Mr. Arapahoe heard them say things like, "Oh no, help!" in a high-pitched voice mocking Mr. Arapahoe's pleas for help, and "Let's just wait and see what they do," as they walked past his cell.

36.     Mr. Roman ordered Mr. Arapahoe to hit the duress button, and Mr. Arapahoe did so. Officers walked past the cell and without looking, turned off the call light, and told him to "Quit hitting your fucking buttons."

37.     On or about mid-September 2014, Officer Smith performed his monthly rounds to check on each of the cases he managed. Without talking to Mr. Arapahoe, he put a note up to Mr. Arapahoe's window indicating Mexican was being transferred to USP Florence, and Mr. Arapahoe was going to be transferred back to FCI Florence.

38.     After Officer Smith left, he never checked on Mr. Arapahoe again, and never ensured that Mr. Arapahoe would be transferred back to FCI Florence.

39.     On or around October 7, 2014, Mr. Roman asked Lieutenant Martin to move him out of Mr. Arapahoe's cell. Lieutenant Martin agreed to move Mr. Roman quickly, and told him "I don't give a fuck" about performing a safety check when moving inmates into new cells.

40.     On or around October 8, 2014, Mr. Roman was moved out of Mr. Arapahoe's cell.

41.     On or about October 8, 2014, Mexican was moved from FCI Florence to USP Florence after he fought with other members of his gang.

42.     On or about October 8, 2014, without any warning to Mr. Arapahoe, Mexican was placed in Mr. Arapahoe's cell.

43.     Upon information and belief, Lieutenant Martin made the decision to place Mexican in Mr. Arapahoe's cell, and did so either deliberately or indifferently without performing any investigation as to whether Mexican's placement would create a safety risk for Mr. Arapahoe.  In fact, he did so despite the fact that immediately upon his arrival at USP Florence, Mr. Arapahoe had specifically alerted Lieutenant Martin to his safety concerns with regard to Mexican, and even requested to speak with USP Florence Warden Daniels concerning the matter.

44.     Other officers (likely USP Florence SHU Unit Manager Tuttoilmondo and USP Florence Case Manager Janusz, and/or USP Florence Case Manager Castro), brought Mexican into Mr. Arapahoe's cell.

45.     In front of the officers, Mexican threateningly asked, "Are you nervous?" and Mr. Arapahoe confirmed that he was nervous. Mexican then told the officers, "We will be fine" and without even looking at Mr. Arapahoe, the officers left.

46.     As his Unit Manager at the USP Florence SHU, Lieutenant Martin was responsible for monitoring the SHU and ensuring the safety of inmates, including Mr. Arapahoe. Mr. Arapahoe's Case Managers at the USP Florence SHU, Officers Castro and Janusz, likewise shared a responsibility for ensuring his safety.  Each of these officers knew or should have known of the serious risk of substantial harm that Mexican posed to Mr. Arapahoe, because as

soon as Mr. Arapahoe had been transferred to the SHU, he immediately informed and pleaded with Lieutenant Martin to protect him from Mexican.

47.    USP Florence Warden Daniels, USP Florence Warden and/or Acting Warden Oliver and USP Florence Warden and/or Acting Warden Schwartz knew or should have known of the threats posed to Mr. Arapahoe by Mexican, which Mr. Arapahoe had expressed to Lieutenant Martin and others, and which had been the subject of a fulsome investigation at USP's sister facility FCI Florence, and was known to the FCI Florence Warden Cozza-Rhodes, as early as September 8, 2014.  Moreover, Officers Daniels, Oliver and Schwartz were responsible for training and supervising Lieutenant Martin and other unidentified USP Florence SHU officers to take threats of sexual and physical assault seriously and take measures to protect inmates such as Mr. Arapahoe from the substantial risk of serious harm.

48.    Nevertheless, after Mexican was left in Mr. Arapahoe's cell, the two men were left alone and unsupervised for over two days.

49.    Unfortunately, contrary to Mexican's assertion, the two cellmates were not "fine." Mexican immediately threatened Mr. Arapahoe and ordered him to rub lotion on Mexican's genital area, chest, arms and back.

50.    Mexican then wrestled Mr. Arapahoe to the ground.  Mexican choked Mr. Arapahoe until he was unconscious, slapped him in the face, struck Mr. Arapahoe in the back with his knee, and punched Mr. Arapahoe in the ribs. As a result, Mr. Arapahoe had bruising and swelling on his ribs and chest, and his throat was sore.

51.    Mexican told Mr. Arapahoe that if he reported this violence to anyone, he would "kick your ass" and "fuck you up."

52.     On the evening of October 8, 2014, Mexican anally raped Mr. Arapahoe, and forced Mr. Arapahoe to perform oral sex on Mexican while Mr. Arapahoe was on his knees with his pants off.

53.     Throughout the day and night, Mr. Arapahoe tried to position himself in front of the camera as much as possible, and hit the duress button many times, hoping an officer would see his injuries and come check on him.

54.     On October 8, 2014, after Mexican was placed in Mr. Arapahoe's cell, not a single BOP employee came to check on Mr. Arapahoe.

55.     On October 9, 2014, in the morning, recreation call was cancelled. Each day, Arapahoe's only chance to leave the cell was during recreation call. Since recreation was cancelled, he was unable to try to escape from Mexican.

56.     After recreation call was cancelled, Mexican decided to work out in the cell, and ordered Mr. Arapahoe to "work out" with him. For two hours, Mexican ordered Mr. Arapahoe to lift a trash bag filled with water and do pushups and sit ups. When Mr. Arapahoe either did not perform them according to Mexican's exacting standards, or was exhausted and was unable to continue, Mexican kicked and punched him.

57.     Mexican again threatened Mr. Arapahoe that if he reported this violence to anyone, he would "kick your ass" and "fuck you up."

58.     On the afternoon of October 9, 2014, Mexican ordered Mr. Arapahoe to clean the cell or he would "beat your ass." Mexican forced Mr. Arapahoe to strip down to his underwear, shirt and socks. Mexican called Mr. Arapahoe a "bitch" and demanded that Mr. Arapahoe repeatedly clean portions of the cell as he threw food and Kool-Aid on the floor. After two hours, Mexican demanded that Mr. Arapahoe resume his "work out," and for an hour, forced Mr.

Arapahoe to do pushups, sit ups, and carry a trash bag filled with water as Mexican kicked and punched him.

59.     As a result of Mexican's morning and afternoon assault of Mr. Arapahoe, by the afternoon of October 9, 2014, Mr. Arapahoe's face was swollen, and he was unable to walk well because of the injuries to his upper thighs.

60.     For three hours, during the late afternoon and early evening of October 9, 2014, Mexican threatened Mr. Arapahoe by describing many of the acts of violence he had committed in the past including that he: stabbed someone to death, assaulted police officers, beat and choked his girlfriends, and tried to set a building on fire. Mexican explained that he liked to be violent. He also threatened that he would treat Mr. Arapahoe the same as his past victims. Mexican said that when they were out of prison, he would find where Mr. Arapahoe lived, break his jaw, steal his car, take all his money, and leave him on the side of the road. Mexican stressed that he acted violently whenever he felt like it, and was not afraid of law enforcement, being pepper sprayed or tasered.

61.     Throughout the day, Mexican ordered Mr. Arapahoe to face the wall whenever an officer walked down the hallway. Not a single BOP employee ever looked through the window.

62.     On the evening of October 9, 2014, Mexican kicked Mr. Arapahoe's feet out from under him, knocking Mr. Arapahoe to the ground. Mexican then commanded Mr. Arapahoe to take a shower. While Mr. Arapahoe was in the shower, Mexican threateningly kicked the shower curtain.

63.     After Mr. Arapahoe left the shower, Mexican looked out the window, and finding again that no BOP employees were in the hallway or checking on the two men, he put his fists up to fight, and demanded that Mr. Arapahoe do the same. Mr. Arapahoe refused.  Mexican slapped

and punched Mr. Arapahoe. When Mr. Arapahoe refused to block Mexican's punches, Mexican

pushed and punched him even harder. Mr. Arapahoe then pushed Mexican, and Mexican

responded by punching Mr. Arapahoe for about ten times until Mr. Arapahoe fell into the

shower. Mr. Arapahoe's knees and chest hit the shower as he fell to the ground. Mr. Arapahoe

stood back up, and Mexican punched and pushed him until he fell into the shower again. While

he was on the ground, Mexican kicked him in the ribs and stomped on his head repeatedly.

64.     Bleeding profusely, Mr. Arapahoe stood in front of the camera in the cell, praying

a staff member would see his injuries and come to his rescue. No one came.

65.     As a result of the assault, Mr. Arapahoe's blood covered the walls and floor.

Mexican ordered Mr. Arapahoe to clean his blood off the cell, and to "hurry up" or "I'll kick

your ass again."  For twenty minutes, Mr. Arapahoe cleaned his blood off the walls and floor.

66.     Mexican then ordered Mr. Arapahoe strip naked and take a shower to wash his

bloody face and body.  After Mr. Arapahoe got out of the shower, Mexican laughed as he

explained that he had beat up Mr. Arapahoe for no reason and that if Mr. Arapahoe ever reported

the assault, or testified in court, Mexican would find him and "do a lot more" than he just did.

67.     As a result of Mexican's evening assault of Mr. Arapahoe, by the evening of

October 9, 2014, Mr. Arapahoe's face was cut near his eye, his cheeks were swollen, he was

unable to open his mouth, and his chest and stomach were bruised.

68.     Mexican then forced Mr. Arapahoe to perform oral sex on him, threatening to

"kick your ass" if he refused. Mr. Arapahoe was unable to open his mouth because of the injuries

Mexican inflicted. Mexican was angered that Mr. Arapahoe could not open his mouth wider, and

punched Mr. Arapahoe in the face several times.

69.     Mexican then anally raped Mr. Arapahoe again. Mr. Arapahoe was in so much pain from the anal penetration that he began to yell out. While continuing to rape him, Mexican put his hand over Mr. Arapahoe's mouth, told him to "shut the fuck up," and punched him in the ribs repeatedly.

70.     After brutally raping him, Mexican ordered Mr. Arapahoe to stay awake until 5:00 a.m. and wake him up for recreation call. Mexican warned Mr. Arapahoe that if he did not wake him up, "what just happened will happen all over again." Terrified, Mr. Arapahoe stayed awake.

71.     Throughout October 9, 2014, Mr. Arapahoe tried to position himself in front of the camera as much as possible, and hit the duress button many times, hoping an officer would come check on him and see his injuries.

72.     On October 9, 2014, not a single BOP employee came to check on Mr. Arapahoe.

73.     On October 10, 2014, after breakfast, when Mexican prepared to leave for recreation in the yard, he instructed Mr. Arapahoe to face away from the officers when they came to the cell, so they would not see his injuries, and ordered Mr. Arapahoe to clean the cell while he was gone.

74.     Mr. Arapahoe faced away from the officers as they undid his handcuffs until Mexican was outside. Mr. Arapahoe then told the officers that he was not safe with Mexican and needed help. Twenty minutes later, Mr. Arapahoe was moved to another cell.

75.     Later on October 10, 2014, Mr. Arapahoe was taken to the Emergency Room in Canyon City, Colorado. Doctors found that he had two tears in his rectum, contusions on his ribs, chest, legs and left bicep, swelling and a laceration on his face.

76.     While he was hospitalized, Mr. Arapahoe asked the four unknown prison officials accompanying him whether he could report Mexican's attacks directly to Warden Daniels. The prison officials told him that he could not, and that the only people with whom he should discuss the incident were the FBI agents investigating the case.

77.     One of the unknown officers who went with Mr. Arapahoe to the hospital laughed when he saw Mr. Arapahoe's injuries, and asked whether he got beat up. When Mr. Arapahoe said that he had, the officer laughed again. When the hospital staff asked whether Mr. Arapahoe was in a fight, the unknown officer rolled his eyes and scoffed as he responded that Mr. Arapahoe was a sexual assault victim.

78.     Mr. Arapahoe was unable to sleep through the night for over a month and had difficulty breathing from his rib injuries. He was given Motrin for a week, but this was insufficient to make his pain tolerable.

79.     BOP employees interviewed Mexican after Mr. Arapahoe was removed from the cell, and Mexican admitted that he had assaulted Mr. Arapahoe so that other inmates would not think Mexican condoned Mr. Arapahoe's homosexuality.

80.     In a belated admission of the unquestionable (and unfortunately now proven) risk that Mexican posed to Mr. Arapahoe, on November 5, 2014, Officer Smith recommended that based on Mexican's sexual assault of Arapahoe, Mr. Arapahoe and Mexican receive formal separation.   Subsequently, Officer Tucker sent a memorandum to FCI Florence Acting Warden B. True and FCI Florence Warden Cozza-Rhodes, who signed and affirmed the decision to separate Mr. Arapahoe and Mexican.  This memorandum is dated November 12, 2014 – a full month after Mr. Arapahoe endured this brutal attack, and well over two months after Warden

Cozza-Rhodes, and other members of the FCI Florence prison administration were placed on actual notice of the threat posed by Mexican on September 8, 2014.

81.     In early November 2014, just weeks later, Lieutenant Martin moved Mr. Arapahoe out of his single cell and into a shared cell with an individual convicted of sexual assault who glibly told Mr. Arapahoe "how easy it is to cut someone's throat." After Mr. Arapahoe reported this behavior, he was moved back to a single cell.

82.     As a result of his repeated rapes and assaults of Mr. Arapahoe, on March 23, 2015, Mexican was indicted for violating 18 U.S.C. § 2246(2), Aggravated Sexual Abuse by Force or Threat, and 18 U.S.C. § 113(a)(6), Assault Resulting in Serious Bodily Injury.

83.     On September 23, 2015, Mexican pled guilty to violating 18 U.S.C. § 113(a)(6).

84.     Mr. Arapahoe is presently out of custody, having completed his sentence and he is currently seeking treatment for Post-Traumatic Stress Disorder resulting from these events, and requires a service animal to support him.

85.     Mr. Arapahoe also suffers from extreme anxiety and depression from these events. As a result, Mr. Arapahoe usually finds it too difficult to be in public, cannot sleep, and cannot form relationships with people because he is unable to trust anyone.

86.     Mr. Arapahoe was released from BOP custody on January 28, 2015, but remains on probation. If Mr. Arapahoe violates the conditions of his probation, he could be returned to USP Florence and risk being again subjected to the substantial risk of assault and rape as a result of Defendants' customs, practices, policies and conduct.

## VI. STATEMENT OF CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
Federal Tort Claims Act Claim -Negligence- Failure to Protect
(Against the United States of America )

87.     Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

88.     At all times relevant to this complaint, all of the aforementioned individual officers (including but not limited to Wardens Cozz-Rhodes, Stancil, True, Daniels, Oliver, Schwartz, and Officers Oliver, Schwartz, Smith, Lammer, McEvoy, Avalos, Wade, Hill, Mansfield, Quintana, Tucker, Martin, Janusz, Castro, and Tuttoilmondo) were employees of the Federal Bureau of Prisons, and therefore were employees of the United States Government.

89.     The United States, through its agency BOP, has a duty of care to provide for the safety and well-being on inmates in its custody, including Plaintiff.

90.     As agents of Defendant BOP, individual officers, warden, and case managers also have a duty of care to provide for the safety and well-being of the prisoners in Defendant BOP custody, including Mr. Arapahoe.

91.     Defendant United States breached that duty in negligently operating and managing FCI Florence and USP Florence by:

    a.   Failing to adopt, incorporate, and enforce such rules, regulations, policies, and procedures for the operation and management of the FCI and USP Florence facilities as would reasonably protect Plaintiff and others detained or incarcerated in the corrections facilities.

    b.   Failing to properly supervise, investigate, and review the operation and management of the corrections facility and the activities and performance of its employees, including but not limited to, Wardens Cozz-Rhodes, Stancil, True, Daniels, Oliver, Schwartz, and Officers Oliver, Schwartz, Smith, Lammer,

McEvoy, Avalos, Wade, Hill, Mansfield, Quintana, Tucker, Martin, Janusz,

Castro, and Tuttoilmondo.

    c.   Failing in the course of its investigation of William Mexican's threats to

Plaintiff's safety and well-being.

92.    The negligence of Defendant United States is a tort under the law of Colorado and

of the United States, and is without justification under any applicable state or federal statute or

rule.

93.    As a result of the negligence of Defendant United States, Plaintiff suffered

profound physical and invasion of his person, in addition to suffering on-going emotional harm,

anguish, insecurity, and shame.

## SECOND CLAIM FOR RELIEF
Federal Tort Claims Act Claim -Negligent Infliction of Emotional Distress
(Against the United States of America)

94.    Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set

forth herein.

95.    As alleged more fully above, Defendant United States was negligent in its care of

Plaintiff by breaching its duty to protect Plaintiff and other inmates incarcerated at FCI and USP

Florence.

96.    The negligence of Defendant United States' employees created an unreasonable

risk of physical harm to Plaintiff when they ignored his well-founded pleas for protection, and

left Plaintiff alone in a cell for days on end with the very man from whom he sought to be

protected.

97.     Defendant's negligence caused Plaintiff to be put in fear for his own safety and such fear was shown by physical consequences such as insomnia, and a profound emotional disturbance that continues to this day.

98.     The negligent infliction of emotional distress of Defendant United States is a tort under the law of Colorado and of the United States, and is without justification under any applicable state or federal statute or rule.

99.     As a result of the negligence of Defendant United States, Plaintiff suffered and continues to suffer emotional distress, including but not limited to extreme anxiety, depression, agoraphobia, and social isolation due to deep and enduring trust issues.

**WHEREFORE**, Plaintiff Alec Arapahoe respectfully requests that this Court enter judgment in his favor and against Defendant United States, and award him all relief as allowed by law, including but not limited to, the following:

a)  Declaratory, injunctive and any other appropriate equitable relief;

b)  Actual economic damages as established at trial;

c)  Compensatory damages, including, but not limited to, those for future pecuniary losses, physical and emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

d)  Punitive damages for all claims allowed by law in an amount to be determined at trial;

e)  Pre-judgment and post-judgment interest at the highest lawful rate;

f)  Attorney's fees and costs pursuant to 28 U.S.C. §2678; and

g)  Such further relief as justice requires.


Dated this 26th day of December, 2017.

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*

_____

David A. Lane
Eleanor K. Wedum
1543 Champa Street, Suite 400
Denver, Colorado  80202
(303) 571-1000
     ATTORNEYS FOR PLAINTIFF